**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| TRIFECTA RED HILLS I, LLC,<br><br>Plaintiff,<br>v.<br><br>TENNESSEE VALLEY AUTHORITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. ________________ |

**COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT**

Plaintiff Trifecta Red Hills I, LLC ("Trifecta"), by and through its undersigned attorneys, for its Complaint for Declaratory Relief and Breach of Contract against Defendant Tennessee Valley Authority ("TVA"), alleges as follows, upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters:

## INTRODUCTION

1. This case is about delays that TVA primarily caused, contract deadlines the parties agreed would move when TVA caused delays, contractually prescribed extensions due to force majeure for events beyond Trifecta's reasonable control, and TVA's refusal to honor those extensions while demanding additional collateral tied to a deadline that no longer applies.

2. Trifecta is developing a solar photovoltaic generating facility (i.e., a solar power plant) in Choctaw County, Mississippi (the "Project") to deliver power to TVA. Two related written agreements govern the Project. Under the Power Purchase Agreement, Contract No. 7571645, dated December 29, 2023 (the "PPA"), TVA agreed to purchase the entirety of the Project's energy output. The PPA fixes the development milestones at issue here, including the Notice to Proceed

deadline and the Expected Initial Delivery Date for power – the Notice to Proceed being linked to Trifecta achieving numerous early-stage requirements and the Expected Initial Delivery Date being linked to the start of power sales after the conclusion of all construction, i.e., the start of commercial operations of the power plant. Under the related Interconnection Agreement, Contract No. 19952, dated June 16, 2026 (the "IA"), TVA is responsible for interconnecting the Project to its transmission system and for the related interconnection milestones, including the commercial operation date at which the Project is to commence normal operations and sale from the Project. The PPA and the IA relate to a single project: Trifecta cannot deliver power under the PPA until TVA completes the interconnection under the IA, and the IA interconnection works are specifically designed for and to be constructed for interconnecting the Project to TVA's high-voltage electricity grid. The IA was preceded by several technical studies and a predecessor agreement, the Engineering & Procurement Agreement dated February 11, 2025 (the "E&P Agreement"), in accordance with standard TVA practice.

3. The delays at the heart of this dispute were primarily TVA's own. TVA (not Trifecta) was contractually responsible for the National Environmental Policy Act ("NEPA") environmental review of the Project's interconnection pursuant to the terms of the IA, including Article FP-6, and the PPA, including Section 3.2(a)(6). This was agreed upon from the outset under Section 3.1 of the predecessor E&P Agreement. TVA was also responsible for the landowner notices that had to precede Trifecta's environmental review fieldwork, and for the timing of the execution of the Interconnection Agreement on which Trifecta's financing, engineering, and construction all depended. TVA let these obligations slip by months, and it said so in writing, formally acknowledging in a January 2026 Change Control Notice its responsibility for the initial schedule delays.

4. NEPA approval was originally planned for Q3 2025, but it was not completed until June 2026 — a delay of six and one-half months. Relatedly, the IA was originally anticipated to be executed on August 1, 2025, but it was not fully executed until June 16, 2026 — a delay of ten and one-half months.

5. The parties anticipated potential delays and contractually addressed the possibility. The PPA provides that TVA "shall extend" the Notice to Proceed Deadline, day-for-day, to the extent Trifecta's failure to meet it was primarily caused by TVA's own failure to take prerequisite actions. This is a mandatory extension that operates by force of the contract and does not depend on TVA's discretionary consent. The PPA contains a parallel day-for-day extension of the Expected Initial Delivery Date for TVA's failure to complete the interconnection facilities, which are currently scheduled to be completed and for the Project to be fully operational at the end of May 2028 (but is subject to further delay, as described below).

6. Further, both the PPA and the IA independently excuse delay caused by events beyond Trifecta's reasonable control. Numerous events beyond Trifecta's reasonable control have contributed to the delays, including: the decision to expand the Project's scope to include a new transmission line after the execution of the PPA and changes in U.S. federal law applicable to solar projects that have impacted solar projects nationwide, some of which have happened recently and are ongoing. These events beyond Trifecta's reasonable control further serve to extend the Notice to Proceed Deadline and the Expected Initial Delivery Date.

7. TVA recognized at least part of the delays when it executed the IA in June 2026, which provides for an in-service date at the end of May 2028 (eight months after the Expected Initial

Delivery Date of September 30, 2027, originally provided for in the PPA, which TVA now refuses to extend).

8. Yet, having responsibility for the key environmental delays that have delayed the Project, having primarily caused the delays, having agreed that events beyond Trifecta's reasonable control would trigger an extension and agreed to extension rights under the PPA, and having already agreed through the terms of the IA to a delay of nine months, TVA now denies the very provisions written to address them. TVA refuses to recognize any extension for purposes of the PPA and insists certain deadlines have passed or are imminently approaching. And rather than count the time its own conduct or force majeure beyond Trifecta's reasonable control cost the Project, TVA has demanded that Trifecta post millions of dollars in additional Performance Assurance under threat of default: collateral keyed to the very Notice to Proceed deadline that has been extended by TVA's delays. Further, TVA refuses to align the interconnection works schedule with the new overall Project schedule.

9. Trifecta brings this action to hold TVA to its contractual bargain. Trifecta seeks declarations that the Project's milestone deadlines have been extended day-for-day for the delays TVA primarily caused or events beyond the reasonable control of Trifecta, that Trifecta is not in default, that the increase in Performance Assurance demanded by TVA is not presently due, and that the IA timeline should be reasonably realigned to the currently delayed Project schedule. In the alternative, to the extent that the delays caused by TVA and other contractual breaches by TVA cause the Project harm, Trifecta seeks damages for TVA's breaches, which include but are not limited to compensation for the loss of federal tax credits for which the Project is reliant.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States. TVA is a corporate agency and instrumentality of the United States created by and existing under the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831 et seq. The parties' PPA and IA agreements each provide that they shall be governed by and construed in accordance with the federal laws of the United States. As contracts of a federal instrumentality governed by federal law, the parties' rights and obligations under the agreements are governed by federal common law.

11. This Court has jurisdiction to declare the rights and legal relations of the parties, and to award further necessary or proper relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

12. TVA has consented to suit and waived sovereign immunity for actions of this nature. The Tennessee Valley Authority Act provides that TVA "[m]ay sue and be sued in its corporate name," 16 U.S.C. § 831c(b), and TVA is subject to suit with respect to its commercial activities, including the agreements at issue here.

13. Venue is proper in this district. A substantial part of the events and omissions giving rise to Trifecta's claims occurred here, including TVA's administration of the environmental review, its transmission-scope and interconnection decisions, and its refusal to extend the deadlines. *See* 28 U.S.C. § 1391(b)(2). Venue is independently proper under the parties' agreements, as both the PPA and IA fix venue for actions related to the respective agreements in the United States District Court for the Eastern District of Tennessee.

## PARTIES

14. Plaintiff Trifecta Red Hills I, LLC is a limited liability company organized under the laws of the State of Delaware, with operations in Choctaw County, Mississippi. Trifecta Red Hills I, LLC is the "Seller" and counterparty to TVA under the PPA and is the "Interconnection Customer" and counterparty to TVA under the IA.

15. Defendant Tennessee Valley Authority is a corporate agency and instrumentality of the United States, created by and existing under the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831 et seq., with its principal offices at 1101 Market Street, Chattanooga, Tennessee. TVA is the "Buyer" under the PPA and the transmission provider under the IA.

## FACTUAL BACKGROUND

### The Parties' Agreements and Their Relevant Provisions

16. On or about June 15, 2023, TVA concluded its Interconnection System Impact Study ("Impact Study"), concluding that an approximately 10.5-mile transmission line would not be part of the interconnection works associated with the Project because it was already planned to be done in connection with a separate project.

17. On or about December 29, 2023, TVA and Trifecta entered into the PPA, under which TVA agreed to purchase the entire energy output of the Project, a solar photovoltaic generating facility to be located in Choctaw County, Mississippi with an approximate capacity of 67.5 MWac.

18. On or about October 23, 2024, TVA completed the final Interconnection Facilities Study Deliverable Package ("Facilities Study"), establishing that the Project would, in fact, need to include an approximately 10.5-mile transmission line, triggering additional NEPA environmental

review. Under the terms of the IA (and its predecessor agreement, the E&P Agreement) and the PPA, NEPA review is the responsibility of TVA (not Trifecta). See PPA Section 3.2(a)(6) (executed in 2023), E&P Agreement Section 3.1 (executed in 2025), and IA Article FP-6 (executed in 2026).

19. On or about June 16, 2026, TVA and Trifecta entered into the IA, which establishes the terms and conditions for interconnecting the Project to the TVA transmission system.

20. The PPA and the IA are related components of a single project and are each governed by the federal laws of the United States. That is, the interconnection facilities to be constructed by TVA under the IA are solely for the purpose of electrically interconnecting the Project to the grid, and the construction timeline thereunder is designed to approximately match the Project construction timeline.

21. The PPA includes a Notice to Proceed deadline (the "NTP Deadline") of June 30, 2026, and an Expected Initial Delivery Date of September 30, 2027. Thus, the original Facilities Study provided for construction based on an initial start of commercial operations for the Project in early October 2027. However, ultimately, the executed IA includes related and sequenced interconnection milestones, including a commercial operation date for the Project of May 30, 2028.

22. Under Section 3.2(c)(2) of the PPA, TVA is required to extend the NTP Deadline on a day-for-day basis to the extent that Trifecta can show that its failure to satisfy Seller's Conditions by the NTP Deadline was primarily caused by TVA's failure to take actions that were prerequisite to Trifecta's satisfaction of those conditions. Section 3.4(b) similarly entitles Trifecta to a corresponding day-for-day extension of the Expected Initial Delivery Date where Trifecta's failure to achieve the Initial Delivery Date is caused primarily by TVA's failure to complete construction

of interconnection facilities. The currently-scheduled commercial operations date for the Project permitted under the IA is the end of May 2028, well after the scheduled commercial operations date under the executed PPA (which was September 30, 2027).

23. Article 16 of the PPA provides that any completion milestones or deadlines are extended by a period equal to the length of time the force majeure event actually prevents the party claiming the force majeure from performing. Article GP-3 of the IA excuses a party from any delay or failure in performance to the extent that the delay or failure is due solely to circumstances beyond the reasonable control of the party experiencing it.

24. Section FP-6.1 of the IA makes TVA responsible for all environmental reviews, analyses, and studies — along with any associated public review processes — necessary to assess the environmental impact of approval of any Interconnection Agreement under the NEPA and other applicable environmental statutes. Similarly, Section 3.1 of the E&P Agreement, a predecessor agreement to the IA, makes TVA responsible for the NEPA review. Finally, TVA also holds responsibility for the environmental review under Section 3.2(a)(6) of the PPA.

25. Section FP-4.2 of the IA additionally obligates TVA to design and construct its facilities in accordance with Good Utility Practice, which would ordinarily anticipate construction of interconnecting power lines on the same schedule as the related power plant to be connected. Section FP-5.1 of the IA requires TVA to cooperate and coordinate the completion of the interconnection works to support the scheduled startup, testing, completion, and readiness of the Project, and Section FP-4.2 of the IA provides that TVA shall provide Trifecta with a revised scheduled completion date promptly upon TVA's learning of any changes in the Scheduled Completion Date (which TVA has learned). Section III of Exhibit IC of the IA provides that the

schedule for interconnection was based on current scheduled activities as of the date of the IA and are subject to change for reasons including force majeure events.

**TVA-Caused Delays to the Project**

26. The Project has been delayed for many months by matters that are TVA's contractual responsibility under both the PPA and IA and by events beyond Trifecta's reasonable control. The required NEPA environmental review, which was TVA's explicit contractual responsibility, was not completed until approximately May 2026, roughly six and one-half months later than the schedule the parties used to set certain contractual deadlines. This lengthy NEPA delay arose after TVA expanded the scope of the Project to include an approximately 10.5-mile transmission line upgrade, which in turn expanded the scope of the required environmental review, all of which occurred after the PPA was executed. Further, TVA delayed issuing the notices to affected transmission-line landowners that were necessary before Trifecta could conduct fieldwork and admitted responsibility for this delay in writing on more than one occasion.

27. In a Change Control Notice issued in January 2026, TVA acknowledged in writing "its responsibility for the initial schedule delays that resulted from the Transmission Line Assessment (TLA) and the expanded project scope to include the approximately 10.5-mile Transmission Line (TL) upgrade, and notification to TL right of way landowners." On other occasions, TVA personnel acknowledged that Project site-preparation work was "being pushed out due to NEPA" and that landowner notifications were delayed by TVA's own internal processes.

28. Further, the IA was not signed and in full force and effect until June 16, 2026 — roughly ten and one-half months later than the date the parties used in the Project development schedule and the August 1, 2025, date estimated in the executed E&P Agreement — a delay attributable to

TVA's responsibilities and to events beyond Trifecta's reasonable control. Because the NEPA environmental review had to be completed before the IA could be finalized, and because financing and procurement in turn depend on an executed IA, TVA's delays cascaded through the Project's critical path.

29. As of May 2026, when the IA was being prepared for execution, it was estimated that an extension of the Expected Initial Operation Date from September 30, 2027 to May 30, 2028, and a comparable extension of the Notice to Proceed Date, would provide for an extension roughly equivalent to the ten and one-half month delay in the executed IA and an approximately six and one-half month delay in the completion of the NEPA review. However, as described further below, TVA's refusal to acknowledge the Trifecta extension rights has itself triggered further delays primarily caused by TVA, and other force majeure events have arisen from changes in U.S. federal law related to solar projects nationwide.

30. As Trifecta informed TVA in August 2026, the delays primarily caused by TVA or force majeure events beyond Trifecta's reasonable control have resulted in an extension of the NTP Deadline. The NTP Deadline is extended to no earlier than September 30, 2027, and the Expected Initial Delivery Date is extended to no earlier than December 31, 2028. The delays remain ongoing due to TVA's refusal to formally acknowledge changes to the Project milestones. Further, the events beyond Trifecta's reasonable control since the execution of the IA and the adjustment of the Expected Initial Delivery Date have resulted in the comparable extension of, and should result in changes to, the timeline for construction and completion of the interconnection works under the IA.

**TVA Refuses the Extensions It Triggered and Demands Additional Collateral**

31. Throughout the development period, Trifecta repeatedly notified TVA of these schedule impacts, including through more than twenty monthly reports delivered to TVA and through a series of letters requesting that TVA acknowledge and formalize a revised Project schedule. TVA at times stated that it was "continuing to evaluate the requested schedule extensions," but never substantively responded to Trifecta's requests to adjust the schedule other than to simply reject the extension.

32. By letter dated August 5, 2026, Trifecta (i) requested that TVA voluntarily agree under Section 3.2(c)(1) of the PPA to move the NTP Deadline to September 2027 and the Initial Delivery Date and Commercial Operation Date to December 2028; (ii) exercised its right to a day-for-day extension of the NTP Deadline under Section 3.2(c)(2) and of the Expected Initial Delivery Date under Section 3.4(b); (iii) gave notice of force majeure under Article 16 of the PPA and Article GP-3 of the IA; and (iv) requested corresponding adjustments to the IA schedule and Facilities Payment Schedule to recognize the further delays commensurate with the overall Project schedule.

33. By letter dated August 21, 2026, TVA responded and denied that the schedule impacts or requested extensions are attributable to TVA or that a force majeure event has occurred, summarily asserting instead that the delays "were caused by Trifecta's decisions." No justification was provided. TVA stated that it "will not extend the currently agreed-upon contractual deadlines under either the PPA or the IA." TVA further asserted only cursorily that Trifecta's Notice to Proceed request "remains incomplete due to Trifecta's failure to provide additional Performance Assurance," and stated that Trifecta has "until September 16, 2026" to provide such additional

Performance Assurance. TVA has rejected the extension requests numerous times without substantively responding at any time.

34. Exhibit D to the PPA establishes a Performance Assurance schedule tied to Project milestones, under which the required amount increases by 150% at whichever comes first — the NTP Deadline or the point specified in Section 3.2(b). TVA's demand for additional Performance Assurance is therefore tied to the NTP Deadline, which is the very date that Trifecta contends has been contractually extended day-for-day as a result of TVA's delays or force majeure events beyond Trifecta's reasonable control. TVA's demand thus depends on the resolution of the parties' dispute over the NTP Deadline.

35. A definite and concrete controversy of sufficient immediacy and reality exists between the parties concerning their respective rights and obligations under the PPA and the IA. TVA has demanded performance by a date certain (September 16, 2026) and has reserved all of its rights and remedies. Absent a declaration of the parties' rights, Trifecta faces the imminent risk that TVA will treat Trifecta as in default, draw on millions of dollars in collateral, or terminate the agreements, notwithstanding that the underlying delays were primarily caused by TVA.

## COUNT I
## (Declaratory Judgment — Extension Of The NTP Deadline Under PPA Section 3.2(c)(2))

36. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

37. Section 3.2(c)(2) of the PPA requires ("shall extend") TVA to extend the NTP Deadline, on a day-for-day basis, to the extent Trifecta's failure to satisfy the Seller's Conditions by the NTP Deadline was primarily caused by TVA's failure to take actions prerequisite to Trifecta's satisfaction of those conditions.

38. Trifecta's inability to satisfy the Seller's Conditions by June 30, 2026, was primarily caused by TVA's failure to take prerequisite actions, including TVA's failure to timely complete the NEPA environmental review for which it was contractually responsible (including due to the expansion of the Project's transmission scope), TVA's delay in issuing landowner notices, and TVA's delayed execution of the Interconnection Agreement. TVA has acknowledged its responsibility for many of these delays in writing.

39. An actual controversy exists because TVA now denies that any extension is warranted and contends that the NTP Deadline has passed, while Trifecta contends that the NTP Deadline has been contractually extended day-for-day by operation of Section 3.2(c)(2).

40. Trifecta is entitled to a declaration that the NTP Deadline has been extended on a day-for-day basis to account for the delays primarily caused by TVA until at least September 30, 2027, and that Trifecta is not in default of the NTP Deadline.

**COUNT II**
**(Declaratory Judgment — Extension Of The Expected Initial Delivery Date Under PPA Section 3.4(b))**

41. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

42. Section 3.4(b) of the PPA entitles Trifecta to a day-for-day extension of the Expected Initial Delivery Date where Trifecta's failure to achieve the Initial Delivery Date is caused primarily by TVA's failure to complete construction of interconnection facilities.

43. To the extent the Project's Initial Delivery Date is delayed, that delay is primarily caused by TVA's failure to complete the interconnection facilities on the schedule contemplated by the parties, including as a result of the delays described above and the mismatch between the PPA's

delivery dates and the later interconnection dates provided under the IA (as should be extended for the reasons set forth above).

44. The Project's Initial Delivery Date, which is when it begins producing electrons and output for initial deliveries under the PPA, cannot occur until the Project is interconnected under the IA. The IA does not provide for this mandatory commercial operations date until May 2028 — a full eight months after the Expected Initial Delivery Date that was identified in the PPA when it was signed.

45. An actual controversy exists because TVA denies that any extension of the Expected Initial Delivery Date is warranted, while Trifecta contends it is entitled to a day-for-day extension under Section 3.4(b).

46. Trifecta is entitled to a declaration that the Expected Initial Delivery Date has been extended on a day-for-day basis to account for TVA's failure to complete the interconnection facilities until at least December 31, 2028.

**COUNT III**
**(Declaratory Judgment — Force Majeure**
**under PPA Article 16 and IA Article GP-3)**
**(*Pleaded in the Alternative*)**

47. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

48. In the alternative, and to the extent any delay in the Project is due to events beyond Trifecta's reasonable control, Article 16 of the PPA provides that the affected completion milestones and deadlines are extended for the period during which the force majeure event actually prevents performance, and Article GP-3 of the IA excuses delay to the extent it is due solely to circumstances beyond Trifecta's reasonable control.

49. The delays described above were beyond Trifecta's reasonable control and could not have been prevented, avoided, or overcome by Trifecta through the exercise of reasonable diligence. The prerequisite actions that were not timely completed — including the environmental review, the landowner-notice steps, and the execution of the Interconnection Agreement — were TVA's contractual responsibility and were not within Trifecta's power to perform or accelerate. Trifecta nonetheless acted diligently to minimize the schedule impact of these events, including by delivering more than twenty monthly reports documenting the schedule impacts and by repeatedly requesting that TVA acknowledge and formalize a revised Project schedule.

50. Trifecta gave TVA timely notice of force majeure. An actual controversy exists because TVA denies that any force majeure event has occurred, while Trifecta contends that qualifying events beyond its reasonable control have extended the affected deadlines.

51. Trifecta is entitled to a declaration that the affected PPA and IA deadlines are extended to the extent qualifying force majeure events have prevented or delayed Trifecta's performance.

**COUNT IV**
**(Declaratory Judgment — Extension of the IA Schedule)**

52. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

53. Under Sections FP-6.1, FP-4.2, FP-5.1, Section III of Exhibit IC, and Article GP-3 of the IA, TVA is responsible for the NEPA environmental reviews necessary for its approval of the Interconnection Agreement, is obligated to design and construct its interconnection facilities in accordance with Good Utility Practice and in a "timely" manner, is obligated to cooperate and coordinate the completion of the interconnection works to support the <u>scheduled</u> startup, testing, completion, and readiness of the Project and to provide Trifecta with a revised scheduled

completion date promptly upon TVA's learning of any changes in the Scheduled Completion Date (which TVA has learned), is obligated to change the dates for scheduled activities including completion of the interconnection works for reasons of a force majeure event beyond Trifecta's reasonable control, and is obligated to acknowledge force majeure events beyond Trifecta's reasonable control.

54. TVA's delays in completing the environmental review (including as triggered by the expanded transmission scope), issuing landowner notices, executing the Interconnection Agreement, and other force majeure events as described above have delayed the interconnection schedule and require a corresponding adjustment to the Scheduled Completion Date and Commercial Operation Date under the IA (and corresponding dates for the preliminary start-up matters of initial backfeed and initial synchronization).

55. An actual controversy exists because TVA denies that the IA schedule should be adjusted, while Trifecta contends that the IA Scheduled Completion Date and Commercial Operation Date are subject to adjustment for the delays caused by TVA and for force majeure.

56. Trifecta is entitled to a declaration that the IA Scheduled Completion Date and Commercial Operation Date are extended to account for the delays caused by TVA or by qualifying force majeure events to no earlier than December 31, 2028.

**COUNT V**
**(Declaratory Judgment — Performance Assurance Not Presently Due; No Event of Default)**

57. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

58. The step-up in Performance Assurance that TVA demands is keyed under Exhibit D to the PPA to the earlier of the NTP Deadline or the issuance of Notice to Proceed under Section 3.2(b). Because the NTP Deadline has been extended day-for-day as a result of TVA's delays or force majeure events beyond Trifecta's reasonable control, the increased Performance Assurance TVA demands by September 16, 2026, is not presently due. The Performance Assurance currently required under Exhibit D is the amount keyed to the Effective Date milestone, which Trifecta has provided and has maintained. However, the increased NTP-keyed amount is not yet required, and Trifecta's election not to post that increased amount is not a failure to comply with the requirements of Exhibit D.

59. Having responsibility for the key environmental delays that have delayed the Project, having primarily caused the delays that advanced the milestone on which its demand depends, having agreed that events beyond Trifecta's reasonable control would trigger an extension, and having already agreed through the terms of the IA to a delay of eight months, TVA may not rely on those delays to place Trifecta in default.

60. Because the increased Performance Assurance is not presently due, Trifecta's decision not to post it does not violate Exhibit D and does not constitute an Event of Default under Section 9.1(f) of the PPA or under any other provision of the PPA or the IA. TVA therefore has no present right, on the basis of Trifecta's non-provision of the demanded increase in Performance Assurance, to declare an Event of Default, to suspend performance, to draw upon the Performance Assurance Trifecta has already provided under both the PPA and the IA, or to declare an Early Termination Date.

61. Separately, TVA is itself in default of a material covenant of the PPA, which provides an additional and independent basis on which the demanded Performance Assurance need not now be posted. Between March and August 2026, Trifecta repeatedly asserted in writing its right to a day-for-day extension of the NTP Deadline under Section 3.2(c)(2) and of the Expected Initial Delivery Date under Section 3.4(b), and asked TVA to acknowledge the resulting revised schedule. On no fewer than four separate occasions over those months, TVA declined to grant, or failed to substantively respond to, Trifecta's requested extension — culminating in TVA's August 21, 2026 letter stating that it would not extend the contractual deadlines under the PPA.

62. Section 3.2(c)(2) of the PPA provides that TVA "shall extend" the NTP Deadline day-for-day for delay primarily caused by TVA. TVA's refusal to confirm that mandatory extension is a failure to perform a material covenant or obligation of the PPA within the meaning of Section 9.1(c). Under Section 9.1(c), such a failure becomes an Event of Default if it is not remedied within thirty (30) calendar days after written notice from the other Party. Trifecta's repeated written notices gave TVA well more than thirty days to remedy its failure to honor the day-for-day extension, and TVA has not done so.

63. Because TVA has failed to cure its default within the time allowed, Trifecta has the present right under Section 9.2(a)(i) of the PPA to suspend performance of its own obligations under the PPA, and Trifecta is exercising that right as of the current date. Trifecta's suspension of performance in response to TVA's uncured default is a further and independent basis on which the demanded additional Performance Assurance need not be posted at this time.

64. An actual controversy exists because TVA contends that Trifecta's failure to post additional Performance Assurance by September 16, 2026, leaves Trifecta's Notice to Proceed

request incomplete and exposes Trifecta to default and its consequences, while Trifecta contends that no such additional Performance Assurance is presently due, that Trifecta is exercising its right to suspend performance in response to TVA's own uncured default, and that Trifecta is not in default.

65. Trifecta is entitled to a declaration that the demanded increase in Performance Assurance is not presently due; that Trifecta's election not to post the demanded increase does not constitute an Event of Default under Section 9.1(f) or any other provision of the PPA or the IA; that Trifecta's exercise of its right under Section 9.2(a)(i) to suspend performance in response to TVA's uncured default is a further basis on which the demanded increase need not be posted; and that Trifecta is not otherwise in default under the PPA or the IA.

**COUNT VI**
**(Breach of Contract — PPA and IA)**
**(*Pleaded in the Alternative*)**

66. Trifecta repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

67. The PPA and the IA are valid and binding contracts. Trifecta has performed its obligations under those agreements except to the extent its performance was prevented, hindered, delayed, or excused by TVA's conduct or by events beyond Trifecta's reasonable control.

68. In the alternative to the declaratory relief sought above, TVA was primarily responsible for the Project delay and breached Sections 3.2(c)(2) and Article 16 of the PPA by repudiating and denying the mandatory extension of deadlines and by refusing to acknowledge Trifecta's right to force majeure extensions for events beyond Trifecta's reasonable control. Further, TVA breached Sections FP-6.1, FP-4.2, FP-5.1, Section III of Exhibit IC, and Article GP-3 of the IA by failing to timely perform the NEPA environmental reviews and for failing to adjust the schedule for

interconnection work as required and by refusing to acknowledge Trifecta's right to force majeure extensions for events beyond Trifecta's reasonable control.

69. To the extent that the delays caused by TVA and breaches by TVA negatively impacted Trifecta, damages are appropriate to compensate Trifecta, including but not limited to compensation for the loss of federal tax credits for which the Project is reliant.

70. Because TVA's failure to honor the mandatory day-for-day extension is a material default under Section 9.1(c) that TVA has not cured within the time allowed, Trifecta presently has the right, under Sections 9.2(a)(ii) and 9.3 of the PPA, to declare an Early Termination Date and to receive a Termination Payment from TVA. Trifecta has not yet exercised that right and reserves it. The amount of any Termination Payment or other damages would be determined.

71. Both the PPA and the IA include an implied duty to cooperate, a duty not to hinder the other party's performance, and an implied covenant of good faith and fair dealing. TVA breached those duties by primarily causing the delays described above, by repudiating and denying the resulting schedule impacts, by failing for many months to respond substantively to Trifecta's extension requests, and by prematurely demanding additional Performance Assurance keyed to a deadline affected by that TVA's own conduct.

72. As a direct and proximate result of TVA's breaches, Trifecta has been damaged in an amount to be determined, including damages associated with loss of its interconnection queue position and of time-sensitive, tax-credit-eligible equipment and financing.

## PRAYER FOR RELIEF

**WHEREFORE**, Trifecta respectfully requests that the Court enter judgment in its favor and against TVA as follows:

A. Declaring that the NTP Deadline under the PPA has been extended on a day-for-day basis to account for the delays primarily caused by TVA until no earlier than September 30, 2027, such date to be determined, and that Trifecta is not in default of the NTP Deadline;

B. Declaring that the Expected Initial Delivery Date under the PPA has been extended on a day-for-day basis to account for TVA's failure to complete construction of the interconnection facilities until no earlier than December 31, 2028, such date to be determined;

C. Declaring, in the alternative, that the affected PPA and IA deadlines are extended to the extent qualifying force majeure events have prevented or delayed Trifecta's performance;

D. Declaring that the Scheduled Completion Date and Commercial Operation Date under the IA are extended to account for the delays caused by TVA until no earlier than December 31, 2028, such date to be determined, and the dates for initial backfeed and initial synchronization are extended to no earlier than August 31, 2028, and October 31, 2028, respectively, commensurate with the foregoing;

E. Declaring that the increase in Performance Assurance demanded by TVA is not presently due; that Trifecta's election not to post the demanded increase does not constitute an Event of Default under the PPA or the IA; and that Trifecta is not in default under the PPA or the IA;

F. Awarding, in the alternative and to the extent Trifecta is not made whole by the declaratory relief requested above, damages for TVA's breaches of contract in an amount to be determined;

G. Awarding such further necessary or proper relief under 28 U.S.C. § 2202 as may be appropriate; and

H. Awarding Trifecta its costs of suit and such other relief as the Court deems just and proper.

Dated: September 15, 2026
Knoxville, Tennessee

Respectfully submitted,
By: *<u>/s/ W. Edward Shipe</u>*

**BROCK SHIPE KLENK**
W. Edward Shipe (TN BPR #023887)
eshipe@bskplc.com
Karli A. Ball (TN BPR #043013)
kball@bskplc.com
265 Brookview Centre Way, Ste. 604
Knoxville, TN 37919
(865) 338-9700

**HUNTON ANDREWS KURTH LLP**
Cassandra C. Collins (*pro hac vice forthcoming*)
scollins@hunton.com
William Newton (*pro hac vice forthcoming*)
wnewton@hunton.com
951 E. Byrd Street, Suite 200
Richmond, VA 23219
Tel: (804) 788-8692
Fax: (804) 343-4509

Attorneys for Plaintiff TRIFECTA RED HILLS I, LLC